UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RASHID RAHMAN | |
| Plaintiff | 23-cv-5665 |
| -against- | **AMENDED COMPLAINT AS SEVERED FROM *ALLEN I* (19-cv-8173)** |
| CHUNG LEE | |
| Defendants. | |
| | (Related to: 19-cv-8173(LAP)) |

## PRELIMINARY STATEMENT

This is a class action by patients in the custody of the New York State Department of Corrections and Community Services ("DOCCS") who require effective pain management and/or neuromodulating medication to treat chronic health conditions. After years of development, in 2017, DOCCS promulgated its Medications With Abuse Potential ("MWAP") Policy, authored by Defendant David S. Dinello and approved and implemented by his colleagues, Defendant Doctors Morley, Koenigsmann, Mueller, Hammer and Paula Bozer. A benign reading of the MWAP Policy shows a stated goal of reducing the prescription of MWAPs in the correctional setting. MWAPs include medications such as opioids, neuromodulating medications such as Neurontin and Lyrica and medications such as Baclofen and Flexeril administered to treat severe muscles spasms. For a medical provider within DOCCS to prescribe any of these MWAPs, the Policy demands the approval of a Regional Medical Director ("RMD") or the Chief Medical Officer ("CMO") before the prescription will be filled. DOCCS administrators suggest this approval process is intended to "get physicians to think about alternative treatments" before prescribing the medications. In truth and practice, the MWAP Policy strips medical treatment decisions from the medical providers and specialists who treat patients and puts it in the hands of remote medical administrators, who

invariably deny the MWAP medications, no matter the patient's individual medical needs. The wholesale denial of these medications especially effects an already vulnerable population: one that includes patients with severe spinal and neurological issues, phantom pain from amputations, multiple sclerosis and serious, chronic pain. Many of the representative plaintiffs and purported class members were effectively treated with MWAP medications for years before their medications were abruptly stopped after implementation of the MWAP Policy.  This case does not involve "disagreements over proper medical treatment," nor a "patient's preferred treatment." As the allegations make clear, the patients' treating physicians and specialists requested and/or recommended the medications based on their medical judgment and individualized assessments of the patients. RMDs categorically refuse to approve the medications, based on the medication, not the needs of the patient or the recommendations of his/her treating physicians and specialists.  Once approval is denied, many class members are not even offered effective alternatives. If anything, patients are offered one of a suite of psychiatric medications that are wholly inadequate to treat their chronic pain and/or neurological issues.

As the following allegations make clear, DOCCS has implemented a policy that demands the medical recommendations of outside specialists and treating physicians are completely dismissed and medications are discontinued or never prescribed due to an almost blanket policy. Plaintiffs argue that the MWAP Policy is unconstitutional as applied to patients for whom certain MWAP medications are the most (if not only) effective medications to treat their chronic pain and neurological issues. The implications of stripping effective pain control from an already vulnerable population are well-known to DOCCS and its medical personnel.  On January 13, 2015, Alredo Lopez was found dead in solitary confinement in Great Meadow Correctional Facility.  His suicide note stated that since medical staff had discontinued his nerve medication on December 26, 2014 he had not slept.  His note stated that he could not take the chronic pain anymore.

Despite this senseless death, as alleged below, DOCCS has promulgated the MWAP Policy exposing hundreds of patients to the wanton infliction of pain and suffering in violation of the *Eighth Amendment*.

## JURISDICTION AND VENUE

1.      This action arises under 42 U.S.C. § 1983, *et seq*.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a)(3)-(4).

3.      The acts complained of occurred in the Southern District of New York and other jurisdictions throughout New York State, including the Western, Eastern and Northern Districts of New York. Venue is proper under 28 U.S.C. § 1391(b).

## JURY DEMAND

4.      Plaintiffs demand trial by jury in this action.

## THE PARTIES

### Defendants and State Actors

5.      **DOCCS** is responsible for the confinement and rehabilitation of approximately 49,500 individuals in its custody at approximately 54+ state facilities.

6.      DOCCS is responsible for the medical care of all inmates in its custody.

7.      DOCCS receives state and federal financial assistance.

8.      Neither the New York Health Department of Health nor any other entity provides oversight to DOCCS' medical treatment, other than relating to infectious diseases like tuberculosis or hepatitis C.

9.      DOCCS medical administration effectively creates its own rules.

10.      **Carl Koenigsmann, MD ("Defendant Koenigsmann")** served as the Chief Medical Officer ("CMO") for DOCCS until late 2018. Defendant Koenigsmann is sued in his individual capacity.

11.      **John Morley, MD ("Defendant Morley")** currently serves as the current CMO for DOCCS. Defendant Morley is sued in his individual and official capacities.

12.      **Susan Mueller, MD ("Defendant Mueller")** is a Regional Medical Director ("RMD") and a treating physician at DOCCS. Defendant Mueller is sued in her individual capacity.

13.      **David S. Dinello, MD ("Defendant Dinello")** is an RMD and treating physician at DOCCS. He is sued in his individual capacity.  Defendant Dinello is Chairman of the Pharmacy and Therapeutic Committee for DOCCS.

14.      **Paula Bozer, MD ("Bozer")** is an RMD and treating physician at DOCCS. Bozer is on the Policy Review Committee for DOCCS which oversees development and necessary changes in medical policy. Bozer is the RMD for the Wende "hub."

15.      **John Hammer, MD ("Defendant Hammer")** is an RMD and treating physician at DOCCS. Defendant Hammer is sued in his individual capacity.

16.      **Ann Andola, MD** ("Dr. Andola") is a physician who works for DOCCS.

17.      **Mikhail Gusman, MD** ("Dr. Gusman") is a physician who works for DOCCS.

18.      **Chun Lee, MD** ("Dr. Lee") is a physician who works for DOCCS.

19.      **Jon Miller, MD** ("Dr. Miller") is a physician who works for DOCCS.

20.      **Kathleen Mantaro, MD** ("Dr. Mantaro") is a physician who works for DOCCS.

21.      **Peter Braselmann, MD** ("Dr. Braselmann") is a physician who works for DOCCS.

22.      **David Karandy, MD** ("Dr. Karandy") is a physician who works for DOCCS.

23.      **Kristin Salotti, NP** ("Ms. Salotti") is a nurse practitioner who works for DOCCS.

24.      **Mary Ashong, NP** ("Ms. Ashong") is a nurse practitioner who works for DOCCS.

25.      **Albert Acrish, NP** ("Mr. Acrish") is a nurse practition who worked for DOCCS.

26.      **Qutubuddin Dar, MD** ("Dr. John Doe #1") is a physician who works for DOCCS.

27.     **John Doe #2, MD** ("Dr. John Doe #2") is a physician who works for DOCCS.

28.     **Jane or John Doe, MD #3 - #50** are physicians who work for DOCCS.

29.     **Jane or John Doe, Nurse Practitioners ("NP") or Physician Assistants ("PA") #1 - # 50** are Mid-Level Clinicians who work for DOCCS.

30.     **Facility Treating Physicians and Mid-Level Clinicians ("MDs and Mid-Level Clinicians")** are responsible for the medical treatment of prisoners within the facility where they work. Facility doctors, physician assistants and nurse practitioners answer to the FHSDs, RMDs and CMO.

31.     **Consultants and Specialty Medical Providers** ("Consultants" or "Specialists") are medical professionals who practice either in DOCCS' Regional Medical Unit specialty clinics or outside of DOCCS at area hospitals, emergency rooms and specialty offices. Patients are sent to them for specialty assessment and treatment because DOCCS doctors and specialists do not possess the requisite expertise to treat the referred patient.

### FACTUAL HISTORY – HOW HEALTH CARE IS ADMINISTERED

#### The Role of the Chief Medical Officer ("CMO")

32.     Defendant CMO Morley is the current ultimate arbiter of medical policy for DOCCS.

33.     Defendant CMO Koenigsmann was the ultimate arbiter of medical policy for DOCCS through late 2018.

34.     Though the CMO normally does not treat individual patients, the CMO is directly involved with DOCCS' Office of Counsel and the AG's office when a patient sues DOCCS, often coordinating with RMDs, treating physicians, mid-level clinicians and medical personnel on the facility level to review the patient's records and craft medical and legal responses. The CMO

makes decisions that directly impact the health care of individual patients.

35.     Defendants Morley and Koenigsmann were responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment and medical health care policies.

36.     Defendants Morley and Koenigsmann are charged with developing and regularly updating clinical practice guidelines in an effort to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

37.     As alleged below, the CMO also reviews medical providers MWAP Request forms, approving or denying the provision of MWAP medications to patients.

**The Role of Regional Medical Directors ("RMDs")**

38.     Defendants Dinello, Hammer, Mueller and Paula Bozer are also responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment.

39.     Defendants Dinello, Hammer, Mueller and Paul Bozer are charged with developing and regularly updating clinical practice guidelines to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

40.     Each RMD is responsible for a "hub." A DOCCS' medical hub is a group of correctional facilities within a region. There are five hubs within DOCCS. As of early 2018, Defendant Dinello was in charge of two hubs, due to a staffing shortage of RMDs.

**The Role of MDs and Mid-Level Clinicians**

41.     MDs and Mid-Level Clinicians are the Facility Health Services Directors, treating physicians and mid-level clinicians within DOCCS' 53+ facilities.

42.     The MDs and Mid-Level Clinicians are directly responsible for the healthcare of plaintiff class members.

43.     The MDs and Mid-Level Clinicians are directly responsible for examining plaintiff class members during sick call and scheduled examinations. Along with nurses, MDs and Mid-Level Clinicians respond to the medical complaints of individual plaintiff class members regarding chronic pain, neurological and health issues.

44.     The MDs and Mid-Level Clinicians are directly responsible for sending plaintiff class members for specialist diagnostic testing including MRIs, X-Rays, and electromamyograph ("EMG") testing which assesses the health of muscles and motor neurons.

45.     The MDs and Mid-Level Clinicians are directly responsible for prescribing medications available in the DOCCS' "Formulary Book" when a plaintiff class member requires prescriptive care.

46.     The DOCCS' "Formulary Book," lists all the medications available for doctors to prescribe without approval from an RMD.

47.     Formularies dictate what specific drugs in each therapeutic class are available to physicians to prescribe without further approval.  They are established to offer a limited but viable choice of drugs for most conditions.

48.     For prisons, formularies are also established to ensure that the drugs prescribed are convenient to administer in a correctional environment and have a low potential for abuse.

49.     The 2019DOCCS' "Formulary Book," included Neurontin as a formulary medication. To prescribe, a provider "requires a diagnosis on the prescription;" it must be "nurse administered;" and it is "non-formulary for an O[ffice] of M[ental] H[ealth] diagnosis and use."

50.     MDs and Mid-Level Clinicians cannot prescribe medications that are "Non-Formulary" without the approval of an RMD.

51.     Historically, Non-Formulary medications included narcotics, medications "Scheduled" in accordance with the Controlled Substances Act, and medications not generally carried in DOCCS' pharmacies.

52.     If an MD or Mid-Level Clinician prescribes a Non-Formulary medication he/she must submit a Non-Formulary Request to an RMD for approval.

53.     To submit the Non-Formulary Request for approval, MDs and Mid-Level Clinicians supply information to the RMD, including 1) Name of person requesting med, if not MD 2) whether the medication is a Consultant[or Specialist] Recommendation 3) Generic or trade name of non-formulary drug 4) dose, frequency, dosage form, quantity requested, prior approval number; 5) Condition treated 6) Other associated conditions 7) Formulary alternatives tried (must list medication, dose, frequency and duration; 8) Comments.

54.     An RMD reviews the Non-Formulary Request and adds comments along with his/her initials to show approval, along with an Approval number for tracking with the pharmacies.

**The Role of Consultants and Specialty Medical Providers**

55.     MDs and Mid-Level Clinicians are directly responsible for issuing referrals for patients to outside consultants and specialists when MDs and Mid-Level Clinicians are not skilled or experienced enough to diagnose or treat specific conditions.

56.     DOCCS spends hundreds of millions of dollars in state funds for consultant and specialist services to treat DOCCS' patients in the form of contracts with institutions like Albany Medical Center, Erie County Medical Center, Westchester County Healthcare and Montefiore Mount Vernon Hospital.

57.     According to Defendant Dinello, "If the patient has a medical issue that we need help managing, we would send them to a referral, a consultant, to help us manage the case."

58.     DOCCS Health Services Policy states, "Referrals for outpatient care will be

requested only when necessary medical assessment and treatment services are not available from facility primary care providers."

59.     To facilitate a Referral, an MD or Mid-Level Clinician submits a "Request and Report of Consultation" ("Referral") that includes a synopsis of the patient's particular medical issue drafted by the referring medical provider on the facility level and the reasons he/she believes a visit with a specialist is necessary.

60.     DOCCS' outside quality control provider, Kepro, then reviews the speciality appointment request and approves or denies it.  If denied, an RMD can override the denial.

61.     At the appointment, the specialist then fills out his/her findings on the bottom half of the "Referral," generally in hand.  Sometimes the specialist attaches his/her computer-generated report, like an EMG reading. The specialist report is then given to the MDs and Mid-Level Clinicians for review.

62.     The MDs and Mid-Level Clinicians personally review the reports and recommendations of specialists who treat the plaintiff class members.

63.     To record the fact that an MD or Mid-Level Clinician has reviewed the specialist report and recommendation, he/she initials the report with the date of review.

64.     The MD or Mid-Level Clinician then makes a notation in the patient's AHR regarding the findings and recommendations of the specialist.

65.     The MDs and Mid-Level Clinicians are directly responsible for prescribing specialist-recommended medications.

66.     Treating consultants or specialists have no ability to directly ensure prescriptions to DOCCS' patients, they can only make recommendations to the treating MDs and Mid-Level Clinicians through their reports.

67.     According to Division of Health Services Policy 3.02 "Medication Orders Within

DOCCS Facilities," procedure, "Consultants [and/or Specialists] may recommend medication treatment for inmates, but it is the responsibility of the Department's primary care provider to review the consultant's recommendations and determine the course of therapy. The facility prescriber may modify or decline the recommendations but ***must document their reasons for doing so*** in the Ambulatory Health Record."

68.     In the medical records of over 110 putative class members, **NOT ONCE** did MDs or Mid-Level Clinicians document the reasons for ignoring or dismissing the prescriptions and recommendations of outside consultants and specialists after the MWAP Policy was promulgated (or before).

## DOCCS' Medical Records Thwart Patient Care

69.     In fact, the single biggest impediment to even basic health care within DOCCS is the health records system that allows for incomplete, inaccurate and chaotic medical records.

70.     Patient records are kept in two places: the paper copy ambulatory health record ("AHR") kept at the facility and an electronic rendition maintained on the Facility Health Services Database ("FHS1").

71.     The AHR is maintained in two files: a small "active" file kept in the clinic with the most recent provider notes and specialty recommendations and an "inactive" file kept somewhere else in the facility in storage.

72.     Nurses or clerks often "thin" a patient's active file and take older materials to be stored in the inactive file.

73.     If a provider, RMD or CMO needs to consult with older specialist recommendations, diagnostic testing or results, he/she must get someone at the facility to go through the inactive file boxes and look for the relevant materials.  Far more often, the provider, RMD or CMO relies upon inaccurate entries on the FHS1 system.

74.     The FHS1 records are electronically stored on a network accessible through monitors in each DOCCS facility or administrative office.

75.     Through the FHS1, RMDs have limited access to plaintiff class members' history of specialty appointments, hospital stays, prescription histories, medical problem lists or specialist recommendations

76.     The FHS1 entries are input at the facility and, generally, are incomplete renditions of the patients' medical problems, the recommendations of specialists and provider interactions.

77.     Many FHS1 entries leave out the most relevant information.  For instance, on January 5, 2018 putative class member Roderick Reyes, who suffers from sickle cell anemia and constant hospitalizations due to crises, saw Dr. Ahmed Asif, his hematologist.  Dr. Asif recommended that DOCCS' providers, "continue his original dose [of MS Contin] at 60 mg [twice a day] to keep him from going to the hospital.  For breakthrough pain use Motrin 800 mg PO [three times a day as needed].

78.     The correlating FHS1 entry for Dr. Asif's recommendation says, "[Return to Clinic] [none] no [follow-up] indicated. Recommend labs every month."

79.     Anyone reading the FHS1 entry would have no idea that Dr. Asif wanted the patient maintained on 60mg twice a day of MS Contin to keep the patient out of the hospital with sickle cell crises.

80.     These inaccuracies are rampant and all-too-common in the FHS1 system.

**Medical Intake At DOCCS**

81.     When a patient is first 'drafted in' to DOCCS he/she generally resides at Downstate Correctional Facility ("Downstate") or another 'intake' facility until staff conducts a medical assessment and a department called "Movement and Classification" determines the best housing

for the patient.

82.    The medical staff at Downstate maintains a patient on all the medications and prescriptions he was taking before being "drafted in" to ensure continuity of care.

83.    The medical staff at the intake facility conduct a thorough individualized assessment of the patient's health issues for use by practitioners in receiving facilities.   Their findings related to major disease or mobility issues are entered into the patient's Medical Problem List.

84.    Upon transfer to a facility for housing, a nurse is supposed to conduct an "assessment,' of the patient. If an inmate needs medications prescribed, a medical provider is given the medication list to review.

85.    To quote sworn testimony of a DOCCS physician, "[we] continue the meds we feel that [are] appropriate or discontinue meds we feel are not appropriate." This arrangement can abruptly interrupt or end a patient's treatment.

86.    However, Defendant MDs and Mid-Level Clinicians often do not see or examine the patient, nor do they review the medical charts before stopping or re-prescribing medications on intake. Sometimes, the patient's AHR has not even arrived with them.

87.    Long before promulgation of the MWAP Policy, the abrupt discontinuation of medications was based on nothing more than a facility "policy," as each FHSD and/or physician initiated his/her own preferences with little regard to continuity of care or the needs of the patient.

88.    A patient can be bounced around facilities and have his medications changed each and every time at the whim of medical personnel once he is in the system.

89.    However, before promulgation of an MWAP Policy, if a patient was lucky and ended up at a facility with good health care practitioners, the patient could receive compassionate, appropriate and constitutionally adequate medical care, including MWAP medications to treat

his/her chronic pain or neurological issues.

**Medications With Abuse Potential**

90.     On its MWAP list, DOCCS has included a group of rather ubiquitous medications, including but not limited to the following:

91.     Ativan (generic name Lorazepam) is used to treat anxiety.

92.     Baclofen is a muscle relaxer and antispasmodic agent used to treat Multiple Sclerosis, spinal cord injuries and other spinal cord disorders. There are no other medications that work in the same way Baclofen works.

93.     Fentanyl (this is the generic name) is a synthetic opioid that is 80-100 times stronger than morphine. It should only be used in cancer patients or others with truly unremitting pain.

94.     Flexeril (generic name "Cyclobenzaprine") is also a muscle relaxer that works by blocking nerve impulses to the brain. Flexeril is used in short term doses to control muscle spasms.

95.     Imodium is used to treat diarrhea.

96.     Klonopin (generic name Clonazepam) is used to prevent and control seizures, as well as treat panic attacks.

97.     Lyrica (generic name "Pregabalin") is used to treat fibromyalgia, diabetic nerve pain, spinal cord injury nerve pain and other nerve related pain symptoms. Lyrica is often prescribed in lieu of Neurontin or when Neurontin fails for any number of reasons.[2] Lyrica is a scheduled medication.

98.     Marinol (generic name Dronabinol) is a man-made form of cannabis used to treat appetite issues, severe nausea and vomiting.

99.     MS-Contin (also referred to as Morphine Sulfate, MSSR, Morphine Elixir) is an opioid analgesic used to treat acute and chronic, severe pain.

100.    Neurontin (generic name "Gabapentin") is an anticonvulsant generally taken to control seizures. It is also often prescribed to relieve nerve pain and considered an alternative to Lyrica.[3] Historically, in DOCCS, a patient is prescribed Neurontin if an EMG test shows neuropathy.

101.    Percocet is a combination of oxycodone and acetaminophen used to treat moderate to severe pain.

102.    Phenobarbitol is a barbiturate that slows the activity in the brain and nervous system and is used to treat or prevent seizures.

103.    Robaxin (generic name Mathocarbamol) is a muscle relaxant used to treat skeletal muscle conditions and spasming.

104.    Tylenol #3 (Tylenol-Codeine) is used to relieve mild to moderate pain.  It does contain an opioid pain reliever (Codeine).

105.    Ultram (generic name "Tramadol") is a pain management medication used to treat moderate to moderately severe pain in patients.  The dose should be individualized to a patient's needs and a patient should not take more than necessary to control his/her pain.  Ultram is considered a lower risk alternative to Percocet or other narcotics or opiates.

106.    Vimpat (generic name Lacosamide) is used to treat partial-onset seizures.

107.    Xanax (generic name Alprazolam) is used to treat anxiety and panic disorders.

108.    Xarelto (generic name Rivaroxaban) is used to reduce the risk of stroke.

109.    Zanaflex (generic name Tizanidine) is used to treat muscle spasms caused by conditions like multiple sclerosis and spinal cord injuries.

110.    These medications are not risk free. Like any medication they can be abused, but many of them – including Neurontin and Lyrica -- are considered to have low addiction potential.

111.    The use of the medications DOCCS has deemed MWAP certainly engender some risk.

112.    DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades.

113.    DOCCS' physicians and nurses have submitted at least 41 sworn declarations in federal district courts in the Second Circuit since 2006 discussing the dangers of Neurontin and Ultram within the prison population due to risk of abuse.

114.    Nonetheless, like all physicians, DOCCS physicians and mid-level clinicians continued to prescribe the medications when appropriate as effective treatment for patients' ailments.

115.    To adapt to the risks of diversion and abuse, DOCCS developed a number of policies over the last twenty years including 1) the administration of the medications one-on-one, meaning a nurse watches as the medication is taken by a patient; 2) the crushing and dilution in water so a patient must drink the medication; and, most recently, 3) the administration of certain medications, including Neurontin, in liquid form.

116.    DOCCS can also (and sometimes does) administer a simple blood test that measures the amount of certain MWAPs in a patient's blood stream, as well as the presence of any other illicit medications or drugs. This allows doctors to tell whether a patient is diverting medication or is at risk of negative interactions with other medications or drugs.

117.    Having a patient's blood tested for certain MWAPs and illicit drug levels costs DOCCS no additional money.  DOCCS has a $40,000,000.00 contract with BioReference Laboratories that covers the cost of all testing.

118.    If an RMD, MD or Mid-Level Clinician is concerned about an individual patient's diversion or misuse of MWAP medications, he/she can easily request a blood test to confirm or

deny the concerns.

119.    And the inclusion of some of the medications on the MWAP List is just plain ridiculous.  Dr. John Bendheim testified under oath that he cannot get Imodium for a patient to abate severe diarrhea.  The patient has to suffer.  It is of note that Imodium is abused when it is taken in very large quantities.  DOCCS patients do not have access to the amount of Imodium it would take to get high.

**Standard of Care in the Correctional Environment**

120.    As implemented, the MWAP Policy is an almost wholesale restriction on the prescription of MWAPs, except in cases of acute need or palliative care.  A complete ban on use to treat chronic conditions does not comport with the standards adopted by other prison systems or the Standard of Medical Care in the community.

121.    For instance, NYS DOCCS is an accredited member of the National Commission on Correctional Health Care ("NCCHC").

122.    In 2018, the NCCHC published a position statement on "Management of Noncancer Chronic Pain."

123.    The position states, "Because complaints of chronic pain are common in corrections, corrections clinicians must address the challenges presented. The use of adjunctive medications such as opiates or GABA analogues [these include Neurontin and Lyrica] is particularly troublesome in the correctional environment because of very high percentage of inmates have a history of substance abuse, chemical dependency, and misuse of prescription medications . . . On the other hand, the confinement environment provides opportunities to obtain information (e.g., a patient's physical activities in the housing unit, at recreation, and at work) that can be important when assessing function and when reviewing the efficacy of treatment . . .

Therefore, when patient function remains poor and pain is not well controlled, and other options have been exhausted, a therapeutic trial of medication, including opioids, should be considered.. . Clinicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain). Rather clinicians should consider all aspects of the problem and all available proven modalities."[1]

124.    In its further statement, NCCHC recommended: "Chronic pain should be addressed like other chronic medical conditions, in a systematic, objective, structured manner beginning with diagnosis and treatment planning and proceeding with structured and regular monitoring of progress. Clinicians should establish measurable treatment goals for chronic pain and measure progress against them. . . They must be functional in nature, measured against the patient's established baseline . . . Most chronic pain can be managed through primary care clinicians. However, an interdisciplinary team approach is often beneficial, and specialty care, including pain management, should be available for patients whose function and chronic pain are not improved with treatment… Policies banning opioids should be eschewed.  Opiates should be considered with caution after weighing other treatment options."

125.    In June of 2018 the Federal Bureau of Prisons ("BOP") published its "Pain Management of Inmates," Clinical Guideline.[2] Even the BOP clinical guideline does not prohibit the use of opioids or neuromodulating medications like Lyrica and Neurontin.

126.    The BOP Clinical Guideline lists Neurontin and Lyrica as second line treatments for neuropathic pain after TCA and SNRIs.[3]

---

[1] https://www.ncchc.org/position-statements (last visited August 18, 2019.)
[2] https://www.bop.gov/resources/pdfs/pain_mgmt_inmates_cpg.pdf (last visited August 8, 2019).
[3] Both TCAs and SNRIs are antidepressant medications. TCAs are Tricyclic antidepressant medications. DOCCS doctors favor Pamelor and Amitriptyline. SNRIs are serotoninin-Novepinephorine Reuptake Inhibitors and DOCCS favors Cymbalta. Plaintiff does not contest that these TCAs and SNRIs may work in some patients to help alleviate neuropathic pain, but more often than not, DOCCS patients report awful side-effects like drowsiness, lethargy and diminished cognitive function without neuropathic pain relief

127.    DOCCS is also accredited by the American Correctional Association ("ACA"). The ACA website lists the BOP's Clinical Guideline, "Pain Management of Inmates," as its clinical guideline standard.[4]

128.    In fact, The New York State Department of Health (of which Defendant Morley used to be the Medical Director) has only two main concerns regarding Neurontin/Gabapentin: the recommend avoiding prescriptions in doses higher than 3600 mg per day because there is no evidence of increase in therapeutic dose, and they recommend avoidance of use of Neurontin by a patient benefiting from concurrent opioid treatment.

129.    The American Medical Association ("AMA") also does not restrict the prescription of many of the medications on the MWAP list and Defendant Koenigsmann knew that.   In an October 27, 2017 email he wrote, "Except for expanding the limitations to some highly abused non-opiate medications nothing in the MWAP is outside of DOH and national recommendations for prudent opioid use."   Opioid abuse was one thing, Defendants Koenigsmann and Dinello were knowingly restricting medications far beyond any restrictions found in the community.

130.    In fact, the AMA House of Delegates is focused on removing barriers to treatment and appropriate analgesic prescribing for pain management.  The AMA House of Delegates has directed the AMA to actively lobby to have Medicare and Medicaid Services allow for reimbursement of off-label prescription of medications, including Neurontin, "at the lowest co-payment tier for the indication of pain so that patients can be effectively treated for pain and decrease the number of opioid prescriptions written."

131.    The standard in the medical community is to use medications like Neurontin, Lyrica

---

[4]

https://www.aca.org/ACA_Prod_IMIS/ACA_Member/Healthcare_Professional_Interest_Section/HC_ResourceLibrary
Home.aspx?WebsiteKey=139f6b09-e150-4c56-9c66-284b92f21e51&hkey=6e0f7ed7-c302-4679-9dc6-
013fc2b62810&New_ContentCollectionOrganizerCommon=2#New_ContentCollectionOrganizerCommon

and other non-opioid MWAPS to treat chronic conditions to reduce the number of opioid prescriptions.  The standard in the medical community is not to restrict all effective treatment.

132.    The reality is that incarcerated patients have a higher-than-average prevalence of disease, as well as substance use disorders and psychiatric illness, often in combination.[5]

133.    Prison populations also have a higher than normal incidence of patients with major spinal cord injuries, due to traumatic events and gun violence.

134.    Treatment protocols are also necessarily different in prisons. Diet modification, exercise and non-medicinal treatments are not as available. Patients in prisons often wait months to see specialists, receive diagnostic testing, surgeries and follow-up care.

135.    Therefore, pharmaceuticals, which already play an important role in the U.S. health care system, may take on an even greater therapeutic importance in prisons.

136.    A December 2017 Pew Charitable Trust study found that use of prescription drugs in the prison population may decrease total medical costs because appropriate use of prescription drugs can avert even more expensive unplanned hospital admissions.[6]

137.    In fiscal year 2015, DOCCS reported that prescription medications accounted for 32% of all health care spending.

138.    Unlike many of the medications on DOCCS' MWAP list, many psychiatric drugs are 'low cost' due to their availability of reasonable lower-costs psychotropic alternatives and the drop in the high price of some older ones due to these drugs coming off patent during the last

---

[5] See The Pew Charitable Trusts, Pharmaceuticals in State Prisons: How departments of corrections purchase, use and monitor prescription drugs (Dec. 2017) at https://www.pewtrusts.org/en/research-and-analysis/reports/2017/12/pharmaceuticals-in-state- prisons (last visited August 18, 2019).
[6] See The Pew Charitable Trusts, *Pharmaceuticals in State Prisons: How departments of corrections purchase, use and monitor prescription drugs* (Dec. 2017) at 5. See https://www.pewtrusts.org/en/research-and-analysis/reports/2017/12/pharmaceuticals-in-state-prisons (last visited August 18, 2019).

several years.[7]

**Policies Before The MWAP Policy Implementation**

139.    Before the MWAP Policy, DOCCS' physicians, including the RMDs, already had troubling "policies" regarding MWAPs.

140.    The more punitive MDs and Mid-Level Clinicians might stop a patient's medications for reasons totally unrelated to patient care. If the patient does not show up at the medication window or if the patient is accused of diverting or abusing medications, the prescriptions could be discontinued with no notice. Medical providers discontinue medications without any investigation into the alleged incident or exploration of why a patient might be missing medication window visits.

141.    Sometimes a brave patient sued for deliberate indifference to his/her medical needs when necessary, effective medications are abruptly discontinued.

142.    DOCCS' defendants repeatedly roll out two justifications for stopping a patient's MWAP medication. They sign declarations that assert: 1) the patient is a drug addict or abuser, or 2) the DOCCS defendant lists each and every time an Ambulatory Health Record entry exists for the patient, implying because he/she was seen by a health care practitioner there can be no deliberate indifference.[8]

143.    Dr. Jacqueline Wolf, a DOCCS doctor, summarized DOCCS' position best in an email to RMDs, "[So long as the patient] is seen within a reasonable amount of time, complaint addressed, exam documented, and rational for medical decision made [we're safe]. Hopefully, the

---

[7] *Id*. at 17.
[8] Often no such interactions exist. Once one becomes familiar with DOCCS' patients' medical records, a pattern emerges wherein nurses record the complaints a patient submits on a sick call slip into the patient's AHR record, but the patient is often not seen. Maybe motrin is dispensed at the next medication run or an appointment with the MD is scheduled for a week or two later, if at all. The recordation of the contents of the sick call slip give the impression to an outsider that the patient was seen for the complaints, but most of the time there is no interaction with medical staff.

A[ttorney] G[eneral]'s office will defend us this way."

144.    DOCCS doctors report being told on many occasions that as long as they "prescribe Tylenol" their actions could not be considered deliberate indifference.

145.    In fact, Defendant Dinello has repeatedly told various DOCCS' providers not to worry about lawsuits because the "lawyers take care of it."

146.    A sampling of 133 public *pro se* prisoner cases alleging deliberate indifference for the revocation of Neurontin or Ultram by DOCCS physicians in the Second Circuit demonstrate that the Attorney General's office systematically submits a standard declaration signed by a DOCCS medical provider accusing the *pro se* plaintiff of diversion, drug abuse or hoarding.

*147.*    In every single sampled case the pleadings were dismissed due to the *pro se* prisoner's inability to rebut the accusations.

148.    In another large sampling of *pro se* Eighth Amendment cases a DOCCS medical provider will outline in a declaration the number of times a patient was seen by some sort of medical provider, creating the guise that the patient had been treated merely because there was interaction with health care staff.

149.    DOCCS decided to solidify these already constitutionally questionable actions into the MWAP Policy.

## Development of the MWAP Policy

150.    In 2006, Defendant Dinello was working as an emergency room physician in area hospitals and began working for DOCCS part-time as well.

151.    He soon ran into trouble.  In 2007 and 2008 he failed to treat patients in the Auburn Emergency Room before discharging them.

152.    Arguably in response to Defendant Dinello's malpractice issues, he started a

company that offers drug-testing and evaluations of employees – services that do not require a medical license.

153.    He also started to pursue his "passion" for addiction issues, an area of medical practice for which he received no additional or specialized training.

154.    In 2010, the New York State Department of Health State Board of Professional Medical Conduct charged Defendant Dinello with three counts of failing to adequately evaluate patients prior to discharge from an emergency room.

155.    In Defendant Dinello's words he was, "accused of not ordering additional testing or prescribing medications for patients."

156.    Defendant Dinello plead guilty and was prohibited from practicing emergency medicine again and sentenced to three years' probation for the practice of non-emergency medicine, during which time he was to be monitored by another doctor.

157.    The Commonwealth of Pennsylvania followed suit and placed Defendant Dinello on probation with an adjudication and order dated May 5, 2011.

158.    Despite these very serious charges and adjudications, DOCCS named Defendant Dinello Chairman of its Pharmacy and Therapeutic Committee in which role he crafted policies and procedures and oversaw primary care guidelines for the medical providers of almost 50,000 patients.

159.    Unbelievably, Defendant Koenigsmann allowed Defendant Dinello to draft a new policy on Medications With Abuse Potential ("MWAP"), despite the fact that Defendant Dinello had no specialized addiction training, no pain management training and was stripped of his emergency medical license for not properly evaluating or treating patients.

160.    Defendant Dinello wrote the policy in rough form in 2015 and Defendant Koenigsmann promulgated it on June 2, 2017.

161.    On September 10, 2018 Defendant Koenigsmann signed a revised version of the MWAP Policy.

162.    But there were earlier versions and efforts related to the MWAP Policy that resulted in the discontinuation of a patient's effective pain or neuropathic pain management medication before June 2, 2017.

163.    Doctor Michelle Belgard, the Facility Health Services Director at Five Points, who worked directly under Defendant Dinello, testified under oath in 2016 that Defendant Dinello had already targeted Neurontin, Baclofen, Lyrica and any scheduled medications. She testified, "we no longer prescribe Morphine, Percocet, or [Ultram] . . . we are trying to remove those medications."

164.    Of Neurontin in particular she testified, "[Dinello] is currently trying to change the policy on the use of Neurontin to limit its use."

165.    Defendant Dinello has also testified under oath that "in the prisons I took care of, this was something I was already doing as a health care provider."

166.    In fact, the medical personnel in several facilities in Defendant Dinello's "hubs" tell patients repeatedly, "you cannot get that medication here," or "we do not use that medication," or "we do not give that."  This is especially true at Groveland, Franklin, Five Points, Elmira and Marcy Correctional Facilities – all controlled by Dinello.

167.    Certain RMDs and facilities started rolling out the MWAP restrictions and policy implementation well before the Policy was actually promulgated by Defendant Koenigsmann.

168.    Defendant Dinello started refusing approvals of the MWAPs on "Non-Formulary" Request forms from treating MDs and Mid-Level Clinicians as early as 2016.

169.    On March 23, 2017 Defendant Koenigsmann sent an email to all Facility Health Services Directors and Nurse Administrators and asked that they "provide this memo to all primary

care providers." He wrote, "The Division of Health Services will be issued a Health Services Policy regarding medications with abuse potential in early summer (does not apply to reception or classification centers). This is in response to the devastating nationwide epidemic of substance abuse and addiction and is in accordance with AMA guidelines. The policy will limit the use of controlled substances along with medications that have significant abuse potential within DOCCS. The policy will also restrict where the patients can be housed. . . This notice is being sent in advance to allow providers to reevaluate patients on the medications and begin to make appropriate changes in anticipation of issuance of the policy."

170.    Accordingly, some providers started discontinuing MWAP medications.

171.    Once the MWAP Policy went into effect, a provider would no longer submit a "Non-Formulary drug request" for a MWAP medication. She or he would submit an MWAP Request Form.

172.    Under the MWAP Policy, an MD or Mid-Level Clinician submits the MWAP Request Form to the RMD in charge of his/her "hub."

173.    The MWAP Request Form asks for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue.

174.    The MWAP Request Form also asks if there is any recent evidence of drug diversion or abuse by the patient.

175.    To conduct a review of the MWAP Request Form, the RMDs have access to the limited portions of the patient's medical history available on the DOCCS' FHS1 database.

176.    RMDs do not have access to the patient's personal paper AHR which is kept at the facility where the patient is in custody.

177.    Based on the MWAP Request Form contents the RMD -- and not the patient's

medical provider -- determines whether a patient will receive an MWAP.

178.    In 2018, under oath, Defendant Dinello was asked whether the MWAP Policy would force a facility doctor to discontinue MWAP medications that were effectively treating patients.

179.    Defendant Dinello responded, "That was up to them. That's the individual provider's prerogative, I assume."

180.    This response was categorically untrue.  The MWAP is a "policy" and not a practice guideline.

181.    MDs and Mid-Level Clinicians within DOCCS must discontinue an MWAP prescription if it is not approved by the RMD. The pharmacies will not fill a prescription for an MWAP without RMD approval.

182.    An MD or Mid-Level Clinician has no ability to provide the medication once an RMD refuses to approve the prescription.

183.    Defendant Koenigsmann testified under oath, "A policy requires adherence. A practice guideline is a guideline; it's a recommendation for care. . . The regional medical directors felt strongly that this should be policy, that it required adherence by the providers, not as guidance."

184.    Defendants knew the new MWAP Policy would violate constitutional rights.

185.    In an internal DOCCS email to Defendant Dinello, Defendant Koenigsmann wrote, "[I]n discussions, grievance responses, et cetera, we need to be extremely careful about indicating that anyone is having their medication discontinued because of a new policy. Changing meds based on policy is doomed to failure . . ."

186.    When asked if he meant, "doomed to failure legally," Defendant Koenigsmann responded, "I did mean that.  And I also meant that for the providers --- and this was my reservation

originally for thinking of a practice guideline versus a policy, was it's difficult with licensed clinicians to dictate how they provide care. And this being a policy, we do require that they have to prove certain things before they're able to prescribe these medications, and that's different from out in the free world. There are not similar limitations on providers."

187.    Defendant Koenigsmann added the MWAP Policy was "never designed to eliminate any specific med, medication, or class of medication from its use. It was only to ensure that we have proper oversight over the clinicians ordering the medications."

188.    But the policy does not create "oversight," it had the immediate impact of abruptly discontinuing effective treatment of hundred of inmates on MWAPs, including patients who suffered from epileptic seizures, Multiple Sclerosis, phantom pain, major spinal injuries, and other sources of chronic pain.

189.    Defendant Koenigsmann testified that it was possible that the MWAP policy could have the effect of discontinuing effective medical treatment to patients.

190.    In fact, since the MWAP Policy has gone into effect, many conscientious DOCCS MDs and Mid-Level Clinicians have challenged the policy, especially the suggestion that patients with chronic pain issues should be treated with psychiatric medications to numb them and "drug them up."

191.    A review of the medical records of DOCCS' patients shows consistent patterns of medical providers fighting the RMDs when their patients are stripped of effective MWAP medications. The MDs and Mid-Level Clinicians also attempt to exploit loopholes to get their patients necessary care.

192.    Under the MWAP Policy an MD or Mid-Level Provider can prescribe five (5) days of an MWAP medication without RMD approval.

193.    Medical providers within DOCCS sometimes use this five-day loophole to get

patients in severe chronic pain at least five days of relief in facility infirmaries.

194.    Medical providers check patients with chronic neurological or other chronic pain issues into facility infirmaries for "pain control," meaning the providers are administering the five days of pain management they can get without an MWAP approval from an RMD.

195.    Defendant Mueller has even suspended at least one facility physician for using the five-day treatment loophole to provide patients with relief from chronic, disabling pain.

196.    Medical providers and inmate grievance responses repeatedly tell patients that "Albany" has refused the prescriptions in accordance with 'policy.'

197.    The truth is that after June 2, 2017 Defendant RMDs repeatedly and systematically refused the prescription or re-prescription of MWAPs to patients in desperate need of medications to effectively treat chronic pain, nerve and other health issues, no matter the recommendations of treating providers and specialists, nor the patient's individualized medical needs.

198.    Worse, patients have no available avenue for appeal when their effective medical treatment is discontinued.  All the current methods of appealing unconstitutional medical care lead to an inevitable dead end that recommends the patient, "use the established sick call procedures."

**There is No Redress For A Patient When Effective Medical Treatment Is Discontinued or Denied**

199.    There are five possible avenues of redress for a suffering DOCCS patient: 1) the inmate grievance system; 2) letters to the Chief Medical Officer – written by the patients themselves, their legal advocates or third parties appealing on behalf of patients, like state politicians and members of the clergy who work in the prisons; 3) letters to the NYS Commission of Correction; 4) complaints filed with the NYS Office of Professional Misconduct; and 5) letters to the NYS Department of Health.  These are all dead ends.

**The Inmate Grievance Program Is Unavailable**

200.   The Inmate Grievance System is established at 7 NY CRRR 700 *et seq*. and was intended to be "an orderly, fair, simple and expeditious method for resolving grievances…"

201.   However, the NYS Inmate Grievance System has not been timely administered in several years.

202.   A grievance is supposed to start at the facility's Inmate Grievance Review Committee ("IGRC").  An inmate files a grievance and it is heard by a facility IGRC.  If an inmate is dissatisfied with the IGRC response, he/she must then appeal to the Superintendent.

203.   Once the Superintendent renders a decision, an inmate must appeal the Superintendent's decision to the Central Office Review Committee ("CORC").

204.   Pursuant to 7 NYCRR 701.5, the CORC consists of seven high-ranking DOCCS' administrators or their designees.

205.   Pursuant to 7 NYCRR 701.5(3)(ii) "CORC shall review each appeal, render a decision on the grievance, and transmit its decision ot the facility, with reasons stated, for the grievant, the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received."

206.   An inmate cannot file a cognizable lawsuit in federal court unless he has fully exhausted his administrative remedies and received a decision from CORC.

207.   Not one of those grievances has been answered by CORC within thirty (30) days. In fact, almost all of them filed after 2017 were not even answered within a year.

208.   By way of example, Peter Allen filed a grievance that was received by CORC on November 17, 2017.  CORC rendered a response on January 30, 2019 – over fifteen (15) months later.

209.    Brian Bernard filed a grievance that was received by CORC on December 12, 2017. CORC did not respond until January 23, 2019 – over thirteen (13) months later.

210.    Shannon Dickinson filed a grievance on March 9, 2018 that was not answered by CORC until August 7, 2019 – over seventeen (17) months later.

211.    Shannon Dickinson filed a grievance on April 11, 2018 that was not answered by CORC until October 2, 2019 – over eighteen (18) months later.

212.    Shannon Dickinson filed a grievance on April 16, 2018 that was not answered by CORC until October 9, 2019 – almost eighteen (18) months later.

213.    Shannon Dickinson filed a grievance that was received by CORC on July 31, 2018 that was not answered until October 2, 2019 – over fifteen (15) months later.

214.    Aaron Dockery filed a grievance on September 26, 2017.  CORC did not respond until January 30, 2019 – sixteen (16) months later.

215.    John Gradia filed a grievance on September 12, 2017; he did not receive a response from CORC until December 12, 2018 – fifteen (15) months later.

216.    Sean Pritchett filed a grievance on October 3, 2017; CORC did not render a decision until April 17, 2019 – almost eighteen (18) months later.

217.    Rashid Rahman filed his grievance on July 5, 2017; CORC did not answer until February 20, 2019 – over nineteen (19) months later.

218.    Plaintiffs' counsel currently possesses over seventy (70) CORC responses to putative class members.  Not one was responded to in less than a year.

219.    In sworn testimony, Defendant Morley was asked, "[When a patient] file[s] a grievance, and let's pretend [his] pain medication has been discontinued and [he's] in a lot of pain, according to [him]. So [he] file[s] a grievance, but [he doesn't] get a response for 14 months; do

you think that's an appropriate avenue for a patient to address what he perceives to be a pressing medical issue?  Dr. Morley answered, "No."

220.    And the delays will not improve.

221.    In a sworn declaration submitted in April of 2020 to Judge Sannes of the Northern District of New York, Rachel Sanguin, DOCCS' Assistant Director of the Inmate Grievance Program for DOCCS, stated, "During calendar year 2019, there were approximately 8,090 grievances appealed to CORC….the voluminous number of appeals, correspondence and record requests received by CORC has contributed to the delay."

222.    And none of them were found in favor of the patient.  Each and every response from CORC starts with the statement: "Grievant's Request Unanimously Accepted In Part" – yet, nothing the patient grieved was 'accepted,' addressed or fixed.

223.    In fact, CORC uses that header, "Request Unanimously Accepted In Part," to then categorize the grievance as having been found "in favor" of the grievant.  This false labeling is used to artificially inflate the numbers on DOCCS' Annual Grievance Reports.  DOCCS' Annual Inmate Grievance Reports for 2016, 2017 and 2018, respectively, suggest that 35.3%, 36.7% and 32.2% of grievances have been decided "in favor of the grievant," but that is not even close to the truth. [9]

224.    Worse, all the medical grievance responses from CORC say the same thing.  They start, "Upon a full hearing of the facts and circumstances presented in the instance case and upon the Recommendation of the Division of Health Services, the action requested herein is accepted in part."

---

[9] DOCCS' Annual Grievance Reports can be found at www.doccs.ny.gov/research-and-reports (last visited November 22, 2020).  DOCCS has not bothered to publish the 2019 report.

225.    The grievance responses all continue, "CORC notes that the grievant's complaint has been reviewed by the Division of Health Services' staff, who advise that a complete investigation was conducted and he is receiving appropriate treatment."

226.    Then some responses contain a few notes specific to the patient which are nothing more than a rendition of the FHS1 provider entries from the last few months listing the times a grievant has allegedly met with health staff.

227.    In late 2018 and 2019 CORC started adding a segment about MWAP to some of the grievance responses, "CORC asserts that all inmates will have access to medically appropriate medications, and that the RMD is required to review and approve the use of potentially unsafe medications that have abuse potential as outlined in HSPM #12.4.  CORC continues to uphold the discretion of the provider to determine the type and necessity of medication administered and finds no compelling reason to revise HSPM 1.24 at this time."

228.    The provider, of course, had no discretion to determine the type and necessity of medications administered – only an RMD has that discretion under MWAP.

229.    Then each grievance ends, "With respect to the grievant's appeal, CORC finds insufficient evidence of improper care or malfeasance by staff and advises him to address further medial concerns via sick call at his current facility."  Sometimes this sentence ends, "via sick call procedure."

230.    Every single grievance is denied in fact and then ends with a line that the grievant should go back to the very same medical providers who perpetrated the delay or denial of medical care in the first place.

**Patient Appeals to the Chief Medical Officer Do Not Work**

231.    Patients within DOCCS' care who require medical treatment can also write the

Chief Medical Officer – currently Defendant Morley.

232.    Hundreds of patients each year and/or their advocates -- whether lawyers, family members    or    others    --    write    Defendant    Morley    (before    late    2018 Defendant Koenigsmann) seeking the intervention of someone they perceive to be not only "in charge" but capable of helping them with their pressing medical needs.

233.    Just for the 110 putative class members identified to Defendants to date, over one hundred advocacy letters were written to the Chief Medical Officer's Office by patients,  lawyers from  Legal  Aid  Society,  Prisoners  Legal  Services  and  smaller  law  firms,  politicians,  clergy members and family members on behalf of putative class members injured by MWAP.

234.    Not once did the Chief Medical Officer intervene on behalf of a patient.

235.    In fact, in sworn deposition testimony Defendant Morley called the advocacy letters and requests for help, "complaints"…and "accusations" ….written because "things are not going the way [the patients] would like them to."

236.    Defendant Morley described the process, "so complaints will come into my office and I read the complaint and then forward it on to the person who oversees the [Regional Health Services  Administrators  ("RHSA")]  and  they  will  contact  the  facility  and  respond  to  the complaints."

237.    Defendant Morley added, "I'll write a couple of notes and initial it at the top and forward it to the RHSA for resolution.  Sometimes I do that via e-mail, sometimes I do that just by passing it on to my secretary who then brings it to the person overseeing the RHSAs."

238.    Defendant  Morley  testified,  "the  process  was  passed  on  to  me  [by  Defendant Koenigsmann] when I arrived that this is what we do . . . I just know that I've read the complaint and it needs a response and someone else is going to respond to it."

239.    Defendant Morley sometimes contacts the nurse administrator of the facility or the physician, the Facility Health Services Director "what are your thoughts on this case?"  But when he asks these questions, Defendant Morley testified that he never turns the responses over to the RHSAs answering the letters so they might help the patient.

240.    Dr. Morley testified under oath, "I can't think of anytime that anybody ever came back and said, "yes [the complaint has merit] they will – I think, I think 100 percent of the time the response is significantly different than the accusations that are in the complaint."[10]

241.    When asked if those very same nurse administrators or providers might have "an incentive not to tell the truth" about a patient's care, Morley replied, "any person is more than capable and has an incentive not to tell the truth."

242.    Even when Rabbi Frank Maxwell directly emailed Defendant Koenigsmann on behalf of Plaintiff John Gradia, the Rabbi communicated that Defendant Mueller had rejected the recommendation of the pain management specialist to prescribe 100mg of Ultram.

243.    Defendant Koenigsmann dismissively replied, "This patient is under the care of pain specialists and has a future appointment scheduled.  Ultram is an addicting agent which is not appropriate for long term management of pain syndromes as is the trend in the community.  The focus of pain management is not complete pain relief but to regain and maintain function.  If the patient is able to carry out his activities of daily living that is successful treatment."  Mr. Gradia was receiving no relief and the lack of treatment was substantially affecting his activities of daily living.

244.    Plaintiffs' counsel possesses almost 100 letters from the Defendant Chief Medical

---

[10] To be fair, after a break and a conversation with his counsel Morley suddenly remembered, "a couple of cases where somebody identified an issue and there was a problem, yes."

Officers to putative class members who lost their effective medication and appealed to Morley or Koenigsmann.  In EVERY SINGLE RESPONSE whether to lawyers, family members or the patient, no help is offered and the letter ends the exact same way: "It is suggested that [you/patient] continue to bring [your/his] medical concerns to the attention of the health care staff using the existing sick call procedure.  I am sure they will make every effort to address [your/his] needs."

245.    Letters to the Chief Medical Officer are nothing more than a dead end for patients requiring help with pressing medical needs, including the discontinuation of effective pharmaceutical treatment.

246.    Unfortunately, letters to outside agencies requesting help on behalf of a DOCCS' patient are just forwarded to the CMO for the same treatment.

**The Commission of Correction Directs Patients to Write the CMO**

247.    Patients can also write the New York State Commission of Correction.

248.    The Commission of Correction is supposed to "promulgate minimum standards for the management of correctional facilities; evaluate, investigate and oversee local and state correctional facilities and policy lock-ups; assist in developing new correctional facilities and provide technical assistance."

249.    According to public records, the Forensic Medical Unit is headed by Christopher Ost, a former EMT.

250.    Every letter submitted by a DOCCS' patient seeking the Commission of Correction's assistant is answered "Please be advised that you should exhaust all remedies available to you at the facility level as well as the Department level (sick call, grievance, facility superintendent, Commissioner of NYS DOCCS, etc) before writing the Commission of Correction. We suggest you forward your medical concerns in writing to your Facility Health

Services Director, Facility Superintendent or to" the Acting Deputy Commissioner/Chief Medical Officer.

## Patient Letters To NYS Politicians Are Forwarded to CMO

251.     Defendants Koenigsmann and Morley, as well as Commissioner Annucci also get "complaints" and "accusations" from New York State Assemblyman David Weprin, members of the Committee on Correction and other politicians.  Defendant Morley testified these are also unfounded.

252.     Defendant Morley personally investigates and answers the letters from politicians regarding the medical care of DOCCS' patients and then forwards his drafts to Commissioner Annucci's office.  Defendant Morley testified that after he drafts a letter, Annucci then, "you know, edits and he sends it."

## Patient Letters To the Office of Professional Misconduct Are Forwarded to the CMO

253.     Patients with pressing unmet medical needs can also write the New York State Office of Professional Misconduct ("OPM") to complain about their care and providers, however, most, if not all, complaints received by OPM are forwarded to Defendant Morley.  When OPM responds to the patient in writing, they direct him/her to write to the Chief Medical Officer of DOCCS -- the same person who believes all "complaints" and "accusations" are unfounded.

254.     Writing to OPM is nothing more than a dead end for patients requiring help with pressing medical needs.

## Patient Letters to the New York State Department of Health Are Forwarded to the CMO

255.     Patients who have medical grievances can also write to the NYS Department of Health, but as Defendant Morley testified, those get forwarded to him as well.

256.     Defendant Morley processes letters addressed to the Department of Health in the

same way he deals with the "complaints" and "accusations" that are addressed to him personally. He reads the letters and then he forwards them to the RHSA to answer.

257.    Letters to the New York State Department of Health results in yet another dead end for patients requiring help with pressing medical needs.

258.    An accurate depiction of patient avenues for help with pressing medical issues is attached as Exhibit 1.

259.    While a patient attempts to use these dead end avenues, he/she suffers.

**Defendants Koenigsmann and Morley Utterly Failed To Respond To Bona Fide Complaints of Patient Suffering Due to MWAP**

260.    Despite years of complaints, concerns and public comment on the devastating impact MWAP was having on patient care, Defendant Chief Medical Officers never did anything to correct it.

261.    On October 30, 2017 the New York State Assembly Committees on Health and Corrections had a public hearing on "Healthcare in New York Correctional Facilities."

262.    Both Commissioner Annucci and former Chief Medical Officer were present for the proceedings.

263.    Annucci himself testified that the top grievance at Albion Correctional Facility was for discontinuation of Neurontin which he erroneously labeled "an extremely dangerous opioid." [11]

264.    Defendant Koenigsmann added the medical grievances that year focused on "[patients wanting] a specific medication over another, want[ing] a specific provider over

_____

[11] It is of note that Annucci had already read this Court's injunction issued in the related case *Medina v. Buther, et al.* 15-cv-1955, as the Court ordered Defendants' counsel to deliver the decision to him at an April 13, 2017 pre-trial conference.

another...."

265.    At the same hearing, Stefen Short, Esq. of Legal Aid Society's Prisoner Rights Project testified about the devastating impact MWAP was having on patients.

266.    Mr. Short started, "blatant skepticism [results in] a failure to exercise competent medical judgment, manifest by the failure of staff to order care recommended by specialist, undue influence by security personnel, and arbitrary reversals of treatment decisions upon facility transfer…"

267.    Mr. Short continued, "we are concerned that [MWAP} has resulted in blaket denials of certain prescription medications without patient centered assessment of prognosis, need or alternative treatment….to that end, we call on the department to review its implementation of policies regarding pain medication to ensure that patient centered determinations are being made and patients pain is adequately treated."

268.    In fact, no one at DOCCS, including the Defendant Koengismann, did anything to help patients.

269.    Defendant Morley has testified that no data was ever culled, no audits were conducted and he NEVER SPOKE WITH EVEN ONE PATIENT.

270.    Despite hundreds of letters to the Defendant Chief Medical Officers, hundreds of grievances, hundreds of letters from legal advocates, public testimony and this Court's various decisions in *Medina II*, no one at DOCCS ever revisited the MWAP policy or its harmful impact on patients.

271.    In fact, just the opposite occurred.  Good doctors who stood up for their patients were demoted, berated in emails, denied the ability to treat their patients, constructively fired and several took early retirement as is laid out in the Complaint in Intervention.

**PLAINTIFF**

272.    **RASHID RAHMAN** ("Mr. Rahman") is 50-year-old inmate who is currently being housed at Shawangunk Correctional Facility ("Shawangunk").

273.    Mr. Rahman suffers from bilateral degenerative AC joint disease, multilevel degenerative changes in the cervical spine with foraminal stenosis and spondylosis predominating and bilateral pulmonary emboli and bilateral popliteal DTVs following the T2T3 laminectomy he underwent due to the T2T3 narrowing with cord compression and disc bulging occurring in his spine. Since the surgery, Mr. Rahman experiences chest pain, extreme pain and numbness in his lower extremities and back pain. Mr. Rahman is wheelchair bound.

274.    To accommodate Mr. Rahman's physical ailments DOCCS allows him to use a walker and a wheelchair.

275.    Mr. Rahman began experiencing weakness in his lower extremities in April 2016 while housed at Clinton Correctional Facility ("Clinton"). Attending physicians at Champlain Valley Physicians Hospital evaluated Mr. Rahman 4 times and dismissed him each time until he finally requested a CT scan which revealed "scattered masses" on his spine and he was transferred to Albany Medical Center Hospital ("AMCH") for further care.

276.    Following a laminectomy on May 27, 2016, Mr. Rahman was discharged to Coxsackie Regional Medical Unit ("Coxsackie") on June 16, 2016 for inpatient rehabilitation through DOCCS. His discharge medication list from AMC included Ultram.

277.    At the time of his transfer he was unable to move his lower extremities. Mr. Rahman arrived at Coxsackie and was given Ultram, Mylanta, Albuterol and Xanax to relieve chest pain, back pain and anxiety. A couple of hours after receiving this treatment he reported that he felt "much better."

278.    On June 22, 2016 Mr. Rahman reported that Ultram relieves his pain and that he was unable to sleep without his pain medicine.

279.    On June 30, 2016 Mr. Rahman complained of chest pain and the Nurse Practitioner on call ordered for him to take Ultram, Mylanta and Xanax. An hour and a half later Mr. Rahman reported that he felt better.

280.    On July 1, 2016 Mr. Rahman was transferred from Coxsackie to Walsh Regional Medical Unit ("Walsh"). Although he did not have a prescription, Mr. Rahman was regularly administered Ultram to treat his pain between July 5, 2016 and September 27, 2016.

281.    Mr. Rahman was successfully treated for his pain with Ultram and Xanax through October 2016 while at Walsh.

282.    On September 28, 2016 a doctor at Walsh summarily discontinued his Ultram prescription. No reason is given in the medical records and no alternative was prescribed. In fact, the records show that the doctor noted he cannot take NSAIDs.

283.    On October 3, 2016 Mr. Rahman wrote a letter of complaint in regard to being in extreme pain since his pain medications were discontinued. He requested medication stronger than Tylenol and said that "when I was taking Ultram and Xanax, I did not feel this pain."

284.    On November 9, 2016 Mr. Rahman was admitted to the infirmary at Shawangunk.

285.    On November 27, 2016 Mr. Rahman reported that his pain was at a level 10. The nurse on call did not administer any medication.

286.    On December 8, 2016, Mr. Rahman reported that he needed to see Dr. Lee due to his "severe back pain." Subsequently, on December 9, 2016 Mr. Rahman sought Ultram to relieve his back pain yet was given Tylenol.

287.    On December 15, 2016 Mr. Rahman reported that he was experiencing chest pain

into his back, down the side and chest tightness. He also noted experiencing "10/10 pain and pressure." He was sent to St. Luke's Cornwall Emergency Room. At the time Mr. Rahman was taking Xarelto and informed the Emergency Room physicians that the symptoms started after no longer receiving the Xanax and Ultram he was prescribed after his spinal surgery.

288.    Mr. Rahman returned to the infirmary at Shawangunk and was then discharged back to Shawangunk's general population.

289.    On January 3, 2017 Mr. Rahman could not attend his occupational therapy appointment due to extreme pain throughout neck and his entire back. He also reported abdominal pain.

290.    In response to Mr. Rahman's continuous pain, Dr. Lee finally re-prescribed Ultram on January 4, 2017. Mr. Rahman was successfully treated for his pain with Ultram between January 4, 2017 and June 26, 2017.

291.    On June 2, 2017 DOCCS promulgated the MWAP Policy.

292.    The MWAP request was submitted on June 20, 2017.

293.    Mr. Rahman's prescription for Ultram expired on June 26, 2017, when it was discontinued due to lack of "MWAP approval."

294.    On June 29, 2017 Mr. Rahman reported his physical therapist at Shawangunk that he was in extreme pain and that he could not do much that day. The physical therapist noted that Mr. Rahman tolerated physical therapy with difficulty.

295.    On July 5, 2017 Mr. Rahman reported experiencing weak and shaking legs. He also reported pain in his back.

296.    On July 14, 2017 Mr. Rahman reported that the combination of the weather and no pain medication made him feel terrible that day.

297.    Mr. Rahman continued to report "extreme pain from the neck down due to no pain meds."

298.    On August 9, 2017 Mr. Rahman reported that his new medicine made him feel sleepy and that he was still experiencing pain on his back. He also reported that his legs were shaking.

299.    On August 16, 2017 the nurse on call reported that the Elavil Mr. Rahman took was helping his pain.

300.    On September 14, 2017 Mr. Rahman reported that he was in "excruciating pain" and that his whole body hurt due to not receiving his pain meds.

301.    Despite Elavil's apparent effectiveness, Mr. Rahman's prescription was discontinued on March 1, 2018. At that time, Dr. Lee prescribed Cymbalta.

302.    On May 5, 2018 Mr. Rahman was admitted to the infirmary for heavy chest pain. 850. Mr. Rahman refused to take Cymbalta between March 7, 2018 and March 12, 2018 because it made him feel very uncomfortable and as though he couldn't breathe. His prescription for Cymbalta was thus discontinued on March 12, 2018.

303.    On June 4, 2018 Mr. Rahman received a new prescription for Depakote, a psychiatric medication.

304.    On July 26, 2018 Mr. Rahman refused to take Depakote. He was concerned about the medication due to the side effects and requested an alternative. Mr. Rahman voiced his concern that the "NYS government is cutting all prisoners off from pain medication." The nurse explained the "current direction medicine and government are reducing the use of narcotics in the treatment of chronic pain." Mr. Rahman replied that it is only prisoners that are being denied pain medication. The nurse responded by saying that "civilians and inmates are being treated the same,"

and that the "DEA, AMA, and the legislative bodies are reducing the use of narcotics, and that alternative therapies such as medications that target the CNS be used for chronic pain." Mr. Rahman insisted that the "alternatives" do not work.

305.    Of course, there is some truth that all practitioners are attempting to reduce the number of prescriptions of opioids, but any competent pain specialist will agree that there are patients who require strong medicinal treatment for their chronic pain.

306.    On January 10, 2019 Mr. Rahman reported weakness and numbness in his legs. He had difficulty standing and using his walker and experienced spasms and tremors to both legs throughout the night.

307.    On February 25, 2019 Dr. Stanley Penc conducted an EMG and reported that Mr. Rahman displayed evidence of a sensory neuropathy involving the lower extremities which could potentially result in paresthesias.

308.    On March 1, 2019 Mr. Rahman reported that he almost fell in the shower due to vibrating legs. The following week at physical therapy, March 6, 2019, he said that on a scale of 1-10 that his back pain was at a 7.

309.    DOCCS continues to refuse to prescribe an effective pain medication that would manage Mr. Rahman's chronic pain despite his well-documented success on Ultram at a low dosage.

## **FIRST CLAIM FOR RELIEF**

### **42 U.S.C. § 1983**
***Deliberate Indifference to Health or Safety – Policy Implementation and Enforcement***
***(Against Defendants Koenigsmann, Dinello, Hammer and Mueller in their***
***individual capacities)***

310.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

311.    On June 2, 2017 Defendants promulgated the Medications With Abuse Potential Policy ("MWAP Policy").

312.    On September 10, 2018 Defendants promulgated a revised version of the MWAP Policy.

313.    Though the policy is not facially unconstitutional, its application and enforcement demands that Plaintiffs' MWAP medications are abruptly discontinued by RMDs who refuse to approve prescriptions.

314.    The denials of MWAP medications take place regardless of the patient's medical needs or the successful treatment to date.

315.    The denials of MWAP medications take place even when necessary diagnostic testing has not been arranged or conducted.

316.    The denials of MWAP medications take place even when effective alternative treatments have not been prescribed or identified.

317.    Enforcement of the MWAP Policy strips a patient's medical care providers of the ability to treat their patients in accordance with their medical judgment.

318.    Enforcement of the MWAP Policy strips the patient's medical care provider of the ability to accept the recommendations of specialty care providers and consultants for prescriptions and treatments.

319.    Instead, the MWAP Policy places decision-making about a patient's treatment solely in the hands of a Regional Medical Director, who is often not familiar with the patient's needs or treatments to date.

320.    Plaintiffs suffer severely and unnecessarily due to Defendants' MWAP Policy.

## SECOND CLAIM FOR RELIEF

**42 U.S.C. § 1983**
***Deliberate Indifference***
*(Against Defendant Dr. Chung Lee in his individual capacity)*

321. Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

322. Defendant MDs and Mid-Level Clinicians send their patients out to consultants and specialty physicians when Defendant MDs and Mid-Level Clinicians not skilled enough to treat a patient's particular condition.

323. Consultants and specialty physicians examine the patients, run necessary testing and craft recommendations for the patient's care which is reviewed by the Defendant MDs and Mid-Level Clinicians.

324. Defendant MDs and Mid-Level Clinicians then agree or disagree with the specialist recommendations and submit Non-Formulary Requests or MWAP Request Forms requesting recommended medications for their patients.

325. Defendant RMDs sought to prohibit and restrict the prescription of MWAP medications and started denying Non-Formulary Requests while crafting the MWAP Policy.

326. On June 2, 2017 Defendants promulgated the MWAP Policy.

327. On September 10, 2018 Defendants promulgated a revised version of the MWAP Policy.

328. Though the policy is not facially unconstitutional, its application and enforcement meant that Plaintiffs' MWAP medications were abruptly discontinued.

329. Defendant MDs and Mid-Level Clinicians then abruptly discontinue a patient's MWAP medications regardless of the patient's medical needs or the successful treatment to date.

330. Defendant MDs and Mid-Level Clinicians discontinue a patient's MWAP medications

even when necessary diagnostic testing has not been arranged or conducted -- leaving patients to suffer while they await testing or specialty appointments.

331. Defendant MDs and Mid-Level Clinicians discontinue a patient's MWAP medications even when effective alternative treatments have not been prescribed or identified.

332. Defendant MDs and Mid-Level Clinicians continue patients on psychiatric medication alternatives that are often ineffective treatment and leave patients with unbearable side effects.

333. Plaintiffs suffer severely and unnecessarily due to the discontinuation of their MWAP medications by Defendant MDs and Mid-Level Clinicians.

## PRAYERS FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court grant the following relief against Defendant DOCCS' physicians and administrators in their individual capacities:

338. Awarding compensatory damages for the pain and suffering of Plaintiff, including compensation for garden variety emotional damages;

339. Awarding Plaintiff reasonable attorneys' fees, costs, disbursements and other litigation expenses, pursuant to 42 U.S.C. § 1988;

340. Retaining jurisdiction over this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future.

341. Ordering such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       December 12, 2020

                                    **LAW OFFICE OF AMY JANE AGNEW, P.C.**

                                    By:  */s/ AJ Agnew*
                                    Amy Jane Agnew, Esq.
                                    *Counsel for Plaintiff*
                                    24 Fifth Avenue, Suite 1701
                                    New York, New York 10011
                                    (973) 600-1724
                                    aj@ajagnew.com


This complaint was filed after severance was ordered on June 13, 2023 of the class, injunctive and declaratory relief claims from those of individual plaintiffs in *Allen I,* 19-cv-8173(LAP).

# EXHIBIT 1

DOCCS PROVIDER
DOCCS Provider allegedly violates patient's rights
PATIENT/PLAINTIFF
Patient files grievance and exhausts
INMATE GRIEVANCE PROGRAM CORC Responses take at least a year and all end "address any medical concerns to medical staff via sick call procedures"
Patient writes CMO directly
Patient writes letters seeking help from outside agencies/people
Letters to Office of Professional Misconduct
Letters to Department of Health
Letters to Politicians
Letters to Commission of Correction
Outside agencies forward letters to CMO or direct patient to write CMO
CHIEF MEDICAL OFFICER
CMO reads and forwards all complaints to RHSA to answer
Regional Health Services Administrators Answer All Letters for CMO Same Way
RHSA LETTER BACK TO PATIENT "use existing sick call procedures"
DEAD END
no relief for patient

